| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JANET GUERRERO,** | ) | |
| | ) | **No. 14 CR 732-4** |
| **Defendant,** | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **DANILO TINIMBANG,** | ) | |
| | ) | |
| **Claimant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Danilo Tinimbang claims an interest in certain assets seized by the Government as property involved in or traceable to a money laundering and health care fraud scheme. The mastermind behind the scheme was Danilo Tinimbang's ex-wife, Josephine Tinimbang, who was charged in a multi-defendant indictment but departed for the Philippines before being prosecuted. Danilo Tinimbang himself was never charged, but several others were. Among those was Janet Guerrero, who pleaded guilty in December 2016 to a charge of conspiracy to launder the proceeds of healthcare fraud. As part of her plea agreement, Guerrero agreed to forfeit certain assets traceable to the conspiracy, and the court entered a preliminary order of forfeiture. In the proceeding now before the court, Danilo Tinimbang asserts an interest in those assets and seeks a hearing regarding the validity of his interest. *See* 21 U.S.C. § 853(n); FED. R. CRIM. P. 32.2(c). Specifically, Claimant Tinimbang maintains that his ex-wife Josephine and their adult children stole money that he invested in a home health care company, ousted him from his role as the president of the company, and used the stolen funds in furtherance of their crimes.

The Government and Mr. Tinimbang have filed cross-motions for summary judgment on his claim. For reasons explained here, the Government's motion is granted and Claimant's motion is denied.

**BACKGROUND**

**A.    The Criminal Case**

On December 17, 2014, a grand jury sitting in the Northern District of Illinois charged 15 individuals with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349.  (*See generally* Indictment [1].)  Janet Guerrero was among those charged.  She was then later named in several superseding indictments.  In a Fourth Superseding Indictment, filed on August 10, 2016, the Government charged Guerrero with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349; conspiracy to pay and receive illegal kickbacks relating to a federal health care program, in violation of 18 U.S.C. § 371; paying illegal kickbacks, in violation of 42 U.S.C. § 1320a-7b(b); and conspiracy to launder money instruments, in violation of 18 U.S.C. § 1956(h).  (*See* Fourth Superseding Indictment [282], Counts 1, 14–26, 31.)  The conspiracy to commit health care fraud allegedly began "in or around January 2008 and continu[ed] through in or around March 2014."  (*Id.*, Count 1 ¶ 2.)  The conspiracy to launder monetary instruments allegedly began "no later than in or around 2008 and continu[ed] to at least in or around 2013."  (*Id.*, Count 31 ¶ 2.)

As discussed in more detail below, the Government alleged that under the direction of Guerrero and her co-conspirators, at least two home health care companies—Donnarich Home Health Care, Inc. ("Donnarich") and Josdan Home Health Care, Inc. ("Josdan")—billed Medicare for services rendered to "homebound" patients, knowing that those patients likely had not received or were not eligible for such services.  (*See* Gov't Local Rule 56.1 Stat. ("Gov't L.R. 56.1 Stat.") [735-1] ¶ 10;  *see also, e.g.*, Fourth Superseding Indictment, Count 1 ¶ 11; Guerrero Plea Agreement [367] ¶ 6.)[1]  Guerrero's co-conspirators included Josephine (also called "Josie"),

---

[1]    The Government also alleged that a home health care company called Pathways Home Health Services LLC ("Pathways") engaged in these billing practices under the direction of Guerrero and her co-conspirators.  (*See* Fourth Superseding Indictment, Count 1 ¶¶ 1(o), 11; Guerrero Plea Agreement ¶ 6.)  The only reference to Pathways in the summary judgment briefing is in the Government's description of its tracing analysis.

Claimant's now ex-wife.  (*See, e.g.*, Claimant Resp. to Gov't L.R. 56.1 Stat. ("Cl. L.R. 56.1 Resp.") [742] ¶¶ 4, 10; Guerrero Plea Agreement ¶ 6.)

On December 14, 2016, Guerrero pleaded guilty to "conspiracy to launder the proceeds of health care fraud and unlawful payments for patient referrals," in violation of 18 U.S.C. § 1956(h).  (Guerrero Plea Agreement ¶ 5.)  The United States agreed to dismiss the other charges against her.  (*See id.* ¶ 17.)  The relevant criminal forfeiture statute provides broadly for forfeiture of property "traceable" to criminal conduct; thus, "in imposing sentence on a person convicted of an offense in violation of Section 1956," the court "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."  18 U.S.C. § 982(a)(1).  Section 982(a)(7) provides specifically that when sentencing "a person convicted of a Federal health care offense," the court "shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense."  18 U.S.C. § 982(a)(7).  As part of her plea agreement, Guerrero agreed to forfeit four assets named in the Fourth Superseding Indictment as property involved in or traceable to the conspiracy to launder monetary instruments. (*See* Guerrero Plea Agreement ¶¶ 18–19.)  Those assets are:

- $1,572,906.88 seized on or about March 5, 2014 from Pershing Advisor Solutions LLC investment account number AUG-709598, held in the name of First USA Finance and Investment;

- $1,438,050 seized on or about April 24, 2014, resulting from the sale of Facebook shares held in Computershare account number C0000017621 in the name of First USA Finance and Investment;

- Real property located at 6420 N. Longmeadow, Lincolnwood, Illinois; and

- $425,967.24 in proceeds from the sale of real property located at 6430 N. Longmeadow, Lincolnwood, Illinois.

(*See* Guerrero Plea Agreement ¶ 19.)

On January 8, 2018, the Government moved for the entry of a preliminary order of forfeiture ("POF") for these assets [623].  The court granted the motion on January 9, 2018 [624].

On January 11, 2018, the court sentenced Guerrero and entered the POF.  In the POF, the court stated that in her plea agreement, Guerrero acknowledged that the four assets referenced above are "subject to forfeiture as property, real and personal, involved or traceable to her violation of" 18 U.S.C. § 1956(h).  (POF [632] ¶¶ (d)(1)–(4).)  After the court entered the POF, the Government provided direct written notice to those entitled to receive it, including Claimant (through his counsel).  (Cl. L.R. 56.1 Resp. ¶ 2.)  The Government also published notice of the POF on an Internet website for 30 days.  (*See id.*)  Through these actions, the Government fulfilled its duty of notice under 18 U.S.C. § 982 and 21 U.S.C. § 853.  (Cl. L.R. 56.1 Resp. ¶ 2.)

On February 23, 2018, Claimant timely asserted a claim to the four assets listed in the POF.  (*Id.* ¶ 3; *see* Verified Claim [675].)  In doing so, he initiated an ancillary proceeding under Federal Rule of Criminal Procedure 32.2(c).  *See* Fed. R. Crim. P. 32.2(c)(1) ("If, as prescribed by statute, a third party files a petition asserting an interest in the property to be forfeited, the court must conduct an ancillary proceeding . . . .").  No other person has submitted a claim to the POF assets.  (Cl. L.R. 56.1 Resp. ¶ 3.)  The Government moved to strike the Verified Claim in June 2018 [697], and the court ordered discovery [708].  After discovery closed in October 2018, the parties filed the motions for summary judgment that are now before the court.

**B.  The Home Health Care Companies**

**1.  Donnarich**

Claimant is the former president, director, and 50% shareholder of Donnarich.  (Gov't Resp. to Cl. Local Rule 56.1 Stat. of Add'l Facts ("Gov't L.R. 56.1 Resp.") [751-1] ¶ 1.)  Claimant founded Donnarich in January 2005 with his then-wife, Josephine, and their children, Don Michael Tinimbang, Richard Tinimbang, and Donna Tinimbang.  (*Id.* ¶ 1; Cl. L.R. 56.1 Resp. ¶ 6.)[2]

---

[2]  Both sides refer to Josephine, Don Michael, Richard, and Donna as the "Tinimbang Defendants."  (*See* Cl. Resp. to Gov't Mot. for Summ. J. and Cross-Mot. for Summ. J. "Cl. Br." [742] at 1; Gov't Reply in Supp. of Mot. for Summ. J. and Resp. to Cross-Mot. for Summ. J. ("Gov't Reply") [751] at 14.)  But of these four individuals, only two (Josephine and Richard) were charged in the criminal case.  (*See generally* Fourth Superseding Indictment.)  Therefore, when the parties refer to the "Tinimbang Defendants," the court assumes they are referring to Josephine and

Claimant invested assets totaling $811,400 into Donnarich "at its inception." (Gov't L.R. 56.1 Resp. ¶ 2.) Those assets included $366,400 from a mortgage loan secured by a marital/family residence in Lincolnwood, Illinois, of which Claimant was a co-owner; $175,000 secured by another mortgage loan taken against the same residence; and $270,000 from a mortgage loan taken against a mixed-use rental property in Chicago, Illinois, of which Claimant and Josephine were co-owners. (*Id.*)

Donnarich was located in Lincolnwood, Illinois. (Cl. L.R. 56.1 Resp. ¶ 6; Guerrero Plea Agreement ¶ 6.) It received Medicare certification on or around May 15, 2005, and then began operating as a home health care company. (Gov't L.R. 56.1 Resp. ¶ 3.) In either May 2006 or sometime in 2007, Josephine and others removed Claimant as the president of Donnarich without his consent or knowledge. (*Compare* Cl. Dep. Tr., Ex. 7 to Gov't L.R. 56.1 Stat. [735-8] at 23:22–23 (Claimant's testimony during his deposition for this case that "they kick[ed] me out as president in 2007"); Cl. L.R. 56.1 Resp. ¶ 13 (agreeing that Claimant was the president of Donnarich until "some unknown time in 2007"); *with* Cl. L.R. 56.1 Stat. of Add'l Facts ("Cl. L.R. 56.1 Stat.") [742] ¶ 4 (stating that "Josephine and the other co-owners of Donnarich purportedly caused [Claimant's] removal as the President and as a Director" in May 2006);[3] Gov't L.R. 56.1 Resp. ¶ 4 (admitting same).) Thereafter, Richard "improperly held himself out as" Donnarich's president and "Josephine took apparent control of Donnarich's business activities." (Gov't L.R. 56.1 Resp. ¶¶ 4–5.)[4]

---

Richard. The parties' briefs make no mention of the disposition of the criminal case against Richard, nor do they discuss the charges against Maribel Tinimbang—Richard's wife and a licensed physical therapist—who is also named in the indictment. Nor have the parties stated whether Claimant has sought financial compensation from Richard or Maribel.

[3] Although the parties have not explained this, the court assumes that "other co-owners of Donnarich" are the adult children.

[4] Claimant contends that, around the same time, Josephine and others also "removed [him] as signatory from [Donnarich's] bank accounts". (Cl. L.R. 56.1 Stat. ¶ 5.) The Government states that it "can neither admit nor deny" that this occurred. (Gov't L.R. 56.1 Resp. ¶ 5.) Any dispute regarding this issue is not material to the motions for summary judgment.

## 2. Josdan and Patient Home Services of Illinois, Inc.

In September 2005, Josephine and Richard incorporated Josdan, another home health care company located in Lincolnwood, Illinois. (Gov't L.R. 56.1 Resp. ¶¶ 9–11; *see* Guerrero Plea Agreement ¶ 6.) They incorporated a third Illinois home health care business, Patient Home Services of Illinois, Inc. ("PHSI"), in April 2008. (Gov't L.R. 56.1 Resp. ¶¶ 9–10, 15.) Josephine and Richard were on the management teams for Josdan and PHSI. (*Id.* ¶ 10.) Claimant maintains that Josephine and Richard "funded Josdan and PHSI with assets that they improperly stripped from Donnarich." (Cl. L.R. 56.1 Stat. ¶ 12.) The Government admits that "at least some of Josdan's and PHSI's initial funding came from assets belonging to Donnarich." (Gov't L.R. 56.1 Resp. ¶ 12.) Specifically, between March 2007 and July 2007, "at least $211,500" was transferred from Donnarich to Josdan. (*Id.* ¶ 13.)[5] Between February 2009 and March 2009, three cashier's checks, each for $100,000, were drawn from a bank account in Donnarich's name. (Gov't L.R. 56.1 Resp. ¶ 16.) The Government states that it can neither admit nor deny that Josephine and Richard "were personally involved in conducting these transfers." (*Id.* ¶ 14; *see also id.* ¶¶ 13, 16.) The Government does admit, however, that two of the checks "were deposited into a PHSI account" and that between January 2007 and August 2007, checks totaling $326,000 were written from a bank account in Donnarich's name to a bank account in Josephine's name. (*Id.* ¶¶ 14, 16.)

Claimant maintains that Josephine and Richard did not provide "any fair market value payment or other consideration to Donnarich" in return for the assets they transferred into Josdan and PHSI. (Cl. L.R. 56.1 Stat. ¶ 18.) Claimant also contends that Josephine and Richard never compensated him for the asset transfers or for removing him as president of Donnarich. (*See* Cl. L.R. 56.1 Stat. ¶ 19.) The Government states that it "can neither admit nor deny" that Claimant

---

[5] Claimant contends that the amount transferred was $215,500. (Cl. L.R. 56.1 Stat. ¶ 13.) This dispute is not material to the motions for summary judgment.

received no compensation or consideration for these transfers; the Government explains that "it believes Donnarich compensated [Claimant] throughout his employment" there, but cites no evidence for this belief.  (Gov't L.R. 56.1 Resp. ¶¶ 18, 19.)

Donnarich had revenue of approximately $4.2 million in 2007 and $6.7 million in 2008.  (*Id.* ¶ 8.)   By 2010, Claimant contends, Donnarich's revenue had declined to approximately $918,000; it had incurred a business loss of approximately $335,000; and it "had no significant assets left." (Cl. L.R. 56.1 Stat. ¶ 17.)  He attributes Donnarich's demise to the allegedly improper transfers of its assets into competing businesses.  (*See id.* ¶ 18.)  The Government admits only that, according to Donnarich's 2010 U.S. income tax return, its gross receipts in 2010 were $818,171.  (Gov't L.R. 56.1 Resp. ¶ 17 (citing Donnarich 2010 Tax Return, Ex. 12 to Cl. L.R. 56.1 Stat. [742-13]).)

Janet Guerrero was an employee of Donnarich and Josdan.  (Cl. L.R. 56.1 Resp. ¶ 10.)  As referenced above, the Government alleged in the criminal case that Guerrero, together with Josephine and others, directed Donnarich and Josdan to bill Medicare for services rendered to "homebound" patients despite knowing that those patients likely had not received or were not eligible for such services.  (Gov't L.R. 56.1 Stat. ¶ 10.)  The health care fraud allegedly began in or around January 2008.  (Fourth Superseding Indictment, Count 1 ¶ 2.)  The Government now contends that "Donnarich, Josdan, and their associated companies" fraudulently obtained Medicare payments "by enrolling non-homebound patients, beginning *as early as 2006*."  (Gov't L.R. 56.1 Stat. ¶ 16 (emphasis added).)  Claimant highlights this discrepancy and maintains that the Government has not "produced evidence to contradict its prior admissions that the Defendants' criminal activity began in 2008."  (Cl. L.R. 56.1 Resp. ¶ 16.)   In its briefing, the Government does not refute this point.  (*See* Gov't Reply at 3.)

Claimant also maintains that "Donnarich was not involved in any alleged fraud or illicit activity" before his family members removed him as president and "cut[ ] off his access to its accounts."  (Cl. L.R. 56.1 Stat. ¶ 20.)  The Government denies this fact but maintains that it is

immaterial to the resolution of the parties' summary judgment motions. (*See* Gov't L.R. 56.1 Resp. ¶ 20.)

## C.    Divorce Proceedings

Josephine filed for divorce from Claimant on November 6, 2006, in the Circuit Court of Cook County, Illinois. (Cl. L.R. 56.1 Resp. ¶ 5.) The court adjudicating the divorce confirmed that as of February 20, 2007, Claimant "ha[d] a 50% ownership in" Donnarich. (Gov't L.R. 56.1 Resp. ¶ 6.) On October 5, 2012, the court entered a Partial Judgment of Dissolution, in which it issued a formal order of dissolution and ordered Josephine to pay maintenance to Claimant in the amount of $15,000 per month. (Cl. L.R. 56.1 Resp. ¶¶ 28–29.) Soon after, Josephine left the United States. (Gov't L.R. 56.1 Resp. ¶ 21.) Claimant received partial maintenance payments of $5,000 per month "for a short time," but Josephine ultimately stopped making payments. (Cl. L.R. 56.1 Resp. ¶ 30.)

On April 10, 2015, the divorce court entered an order granting Claimant's Second Verified Petition for Enforcement of Partial Judgment for Dissolution of Marriage ("Second Verified Petition"). (Gov't L.R. 56.1 Resp. ¶ 22; *see* Order, Ex. 14 to Cl. L.R. 56.1 Stat. [742-15].) On February 23, 2018, the court ordered Josephine to pay Claimant $1,062,750 "as arrears for failure to pay maintenance" under the October 2012 order. (Cl. L.R. 56.1 Resp. ¶ 31.)

## D.    Assets in the Preliminary Order of Forfeiture

Claimant asserts an interest in the four assets listed in the court's POF. He states that he "lacks the resources to hire an outside expert to conduct a financial tracing," but asserts that he and his counsel have on their own prepared such a tracing "evidencing how [Claimant] was defrauded by [the criminal defendants] and thus became the original victim of their scheme." (Cl. L.R. 56.1 Resp. ¶ 33 (internal quotation marks omitted).) In support, Claimant cites his declaration and supporting exhibits. These documents recount the facts discussed above—in summary, that Claimant invested assets he co-owned with Josephine into Donnarich, to the tune of approximately $811,400; Claimant was the president and 50% shareholder of Donnarich;

Josephine and their adult children removed him as president without his knowledge and consent; beginning in March 2007, hundreds of thousands of dollars were transferred from Donnarich to Josdan, PHSI, and Josephine; Donnarich allegedly received no consideration for the transfers; Donnarich's revenue, once in the millions, sharply declined; and Claimant allegedly received no compensation for the asset transfers or his removal as president. (*See* Cl. Decl. in Supp. of Resp. to Mot. for Summ. J. and Cross-Mot. for Summ. J. ("Cl. Decl.") [742-1] ¶¶ 2–19; Exs. 2–12 to Cl. L.R. 56.1 Stat. [742-3–742-13].)

The Government has performed a tracing analysis as well, however, and Claimant admits that he presently "has no basis . . . to specifically dispute any particular portion of the Government's tracing." (Cl. L.R. 56.1 Resp. ¶ 33.) He also admits that the Government's tracing analysis "did not directly identify funds belonging to him as the source of funds used to purchase the POF assets." (*Id.* ¶ 26.) Specifically, during its investigation in connection with the criminal prosecution, the Government "reviewed the movement of funds between Josie, her children, Guerrero, and others involved in the scheme to defraud Medicare and the conspiracy to launder related funds." (Gov't L.R. 56.1 Stat. ¶ 15.) The Government's investigation found, from a review of "bank statements, check images, property records, and other miscellaneous documents" that "Donnarich, Josdan, and their associated companies received millions of dollars from Medicare by enrolling non-homebound patients . . . ." (*Id.* ¶ 16). Those same documents also revealed that "Josie, Guerrero, and their associates used shell and 'pass-through' companies closely associated with Josdan and Donnarich, and without legitimate business purposes, to obscure the purpose of certain transactions." (Gov't L.R. 56.1 Stat. ¶ 18 (citing Decl. of Scott Campbell, Special Agent at the Internal Revenue Service, Criminal Investigation Division, in Supp. of Gov.'t Mot. for Summ. J., Ex. 8 to Gov't L.R. 56.1 Stat. ("Campbell Decl.") [735-10] ¶ 17).) The shell and pass-through companies engaged in several types of transactions, including purchases of cashier's checks, stock, real estate, and personal checks, "to launder the flow of illicit Medicare proceeds." (Gov't L.R. 56.1 Stat. ¶ 19 (citing Campbell Decl. ¶¶ 14–25).) With respect to assets

listed in the Preliminary Order of Forfeiture, the Government asserts that it was able to trace resources that were used for the purchase of those assets "to funds that Medicare deposited into several individual and corporate accounts, including accounts for which Guerrero was an authorized signatory." (Gov't L.R. 56.1 Stat. ¶ 21 (citing Campbell Decl. ¶¶ 14–25).)

The defendants in the underlying criminal case "engaged in several activities to launder the funds relating to the POF assets." (Gov't L.R. 56.1 Stat. ¶ 22.) Specifically, the criminal defendants used "illicitly obtained proceeds paid from Medicare to Josdan's bank account to partially pay for the real property located at 6430 N. Longmeadow, one of the POF assets." (*Id.*) To pay the rest of the purchase price, the defendants used "funds from a shell company they owned and controlled, called 'Illinois Real Estate Investments, LLC.'" (*Id.* (citing Campbell Decl. ¶¶ 18–19); *see also* Shell and Pass-Through Companies, Ex. C to Campbell Decl. [735-14]; Movement of Funds, Ex. D to Campbell Decl. [735-15].) The criminal defendants also "used several pass-through accounts to funnel illicitly obtained Medicare funds into a Pershing Advisor Solutions account ending in 9598, one of the POF assets." (Gov't L.R. 56.1 Stat. ¶ 23 (citing Campbell Decl. ¶ 20); *see also* Shell and Pass-Through Companies; Payments to Account: PAS 9598, Ex. E to Campbell Decl. [735-16].)

Next, the criminal defendants used pass-through accounts—including the Pershing Advisor Solutions account just mentioned—and negotiable instruments such as cashier's checks "to funnel . . . illicitly obtained Medicare funds into a financial account held in the name of First USA Finance and Investment." (Gov't L.R. 56.1 Resp. ¶ 24 (citing Campbell Decl. ¶¶ 21–22).) "[K]ey individuals involved in the underlying Medicare fraud and money laundering conspiracy" controlled First USA. (*Id.*) The funds in the First USA account "were subsequently used to purchase stock in Facebook, Inc.," and "[t]he proceeds of the sale of [that] stock constitute one of the POF assets." (*Id.*; *see also* Shell and Pass-Through Companies; Purchase of Facebook Shares, Ex. F to Campbell Decl. [735-17].) Finally, the criminal defendants "used several pass-through accounts and negotiable instruments to funnel funds from the Medicare fraud and money

laundering scheme into a cashier's check that was ultimately used to purchase the 6420 N. Longmeadow real property, one of the POF assets." (Gov't L.R. 56.1 Resp. ¶ 25 (citing Campbell Decl. ¶ 23); *see also* Shell and Pass-Through Companies; Purchase of 6420 N. Longmeadow, Ex. G. to Campbell Decl. [735-18].) Campbell found no "indication that any money once belonging to Claimant . . . was used to purchase any of these assets." (Campbell Decl. ¶ 25; *see* Gov't L.R. 56.1 Stat. ¶ 26; Cl. L.R. 56.1 Resp. ¶ 26.)

The Government admits that according to its tracing analysis, $398,132 of the funds used to purchase the POF assets came from "unspecified sources." (Gov't L.R. 56.1 Resp. ¶ 24; *see also* Movement of Funds (referencing "other sources"); Payments to Account: PAS 9598 (same); Purchase of Facebook Shares (same); Purchase of 6420 N. Longmeadow (same).)[6] Likewise, the Government admits that approximately "25 percent of the assets at issue in this proceeding are not traceable to fraudulent Medicare billing practices." (Gov't L.R. 56.1 Resp. ¶ 25.)[7] As

---

[6]     Claimant contends that the "unspecified sources" total $401,548 (Cl. L.R. 56.1 Stat. ¶ 24), but the court concludes this dispute does not affect the outcome of the motions for summary judgment.

[7]     Campbell's declaration is the source underlying this admission. Campbell explains that the first step of his tracing analysis was to work backward from the POF assets to determine the original source of income used to purchase them. (Campbell Decl. ¶ 10.) According to Campbell, "the POF assets uniformly traced back to payments that Medicare . . . made into accounts held by Josie Tinimbang, her children, Janet Guerrero, and their associated employees and entities . . . ." (*Id.*) Campbell's next step was to "identify how much of the funding that went into a purchased asset came from this original source." (*Id.* ¶ 11.) He then makes the somewhat confusing assertion that "after identifying the source of the funding for each of the POF assets to be fraudulently obtained Medicare proceeds, I was able to determine that at least 75% of the revenue earned from Medicare was obtained fraudulently." (*Id.*) If the source of the funding for each of the assets was in fact "*fraudulently* obtained Medicare proceeds," it is unclear why only some of those proceeds were "obtained fraudulently." Presumably Campbell means that POF assets trace back to Medicare payments, both legitimate and illegitimate, made into accounts owned by Josephine and others—and that 75% percent of the Medicare payments were obtained fraudulently. The court further assumes that, on that basis, Campbell concluded that 75 percent of the Medicare payments used to purchase the POF assets were fraudulently obtained. And the court assumes that the 75%/25% split has nothing to do with the "unspecified sources" used to purchase the POF assets, because those sources do not amount to 25 percent of the total value of the POF assets. Ultimately, none of these issues affects the outcome of the motions for summary judgment.

explained below, however, the Government contends that "those remaining funds are nevertheless involved in the money laundering conspiracy to which defendant Guerrero pled guilty." (Gov't L.R. 56.1 Resp. ¶ 25.)

<u>**DISCUSSION**</u>

Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute exists, and summary judgment is precluded, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On cross-motions for summary judgment, the court examines the record and makes "all reasonable inferences in the light most favorable to the party against whom the motion was filed." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019). "The party opposing the motion must make a sufficient showing on every element of his case on which he bears the burden of proof; if he fails to do so, there is no issue for trial." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To prevail on his claim that he has an interest in the POF assets, Claimant bears the burden of proving, by a preponderance of the evidence, that he "has a legal right, title, or interest in the property . . . [that] was vested in [him] rather than the defendant or was superior to any right, title, or interest of the defendant *at the time of the commission of the acts* which gave rise to the forfeiture of the property . . . ." 21 U.S.C. § 853(n)(6)(A) (emphasis added); *see* 18 U.S.C. § 982(b)(1) (incorporating same).[8] The requirement that Claimant's interest be evaluated at the time the underlying crimes were committed "governs [the] analyses of both when the property became 'vested in the [Claimant]' and when the [Claimant's] interest became 'superior

---

[8]     Alternatively, Claimant could try to establish that he was a "bona fide purchaser for value of the right, title, or interest . . . and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section." 21 U.S.C. § 853(n)(6)(B). Claimant does not claim status as a bona fide purchaser of value, so the court addresses only whether he can survive summary judgment under Section 853(n)(6)(A).

to any . . . interest of the defendant.'" *United States v. Watts*, 786 F.3d 152, 166 (2d Cir. 2015) (quoting 21 U.S.C. § 853(n)(6)(A)).

Section 853(c) (the so-called "relation back" provision) informs Section 853(n)(6)(A). *See, e.g.*, *Watts*, 786 F.3d at 166; *United States v. Catala*, 870 F.3d 6, 10 (1st Cir. 2017). It provides that "[a]ll right, title, and interest" in forfeitable property "vests in the United States upon the commission of the act giving rise to forfeiture . . . ." 21 U.S.C. § 853(c). "Because forfeitable property vests in the government immediately upon the commission of a criminal act, a third party may prevail under § 853(n)(6)(A) only by establishing that he 'had a legal interest in the forfeited property *before* the underlying crime was committed'—that is, 'before the government's interest vested.'" *Watts*, 786 F.3d at 166 (quoting *United States v. Timley,* 507 F.3d 1125, 1130 (8th Cir. 2007)); *see also, e.g.*, *Catala*, 870 F.3d at 10 (explaining same) (citing, *inter alia*, *United States v. Hooper*, 229 F.3d 818, 821–22 (9th Cir. 2000)); *United States v. Grossman*, 501 F.3d 846, 848 (7th Cir. 2007) (a claimant must show "that its interest is superior to that of the defendant because it arose before he committed the criminal acts giving rise to the forfeiture").

Claimant faces an uphill battle in his effort to establish a superior interest in the POF assets. "[C]ourts have recognized that a petitioner is unlikely ever to prevail at an ancillary hearing under § 853(n)(6)(A) where the forfeited property consists of 'proceeds' derived from or traceable to a criminal offense." *Watts*, 786 F.3d at 166. "Because, by definition, the 'proceeds of an offense do not exist before the offense is committed,' and because 'the government's interest under the relation-back doctrine immediately vests' upon the commission of that offense, any proceeds that ensue from the criminal act belong to the government from the moment that they come into existence." *Id.* at 166–67 (quoting *Timley,* 507 F.3d at 1130). Thus in *Watts*, where a jury had determined that the contested funds were criminal proceeds subject to forfeiture, the funds vested in the government as soon as the defendant committed the crime; the funds necessarily "came into [the claimants'] ownership after that date"; and the claimants could not plausibly assert an interest in the funds under Section 853(n)(6)(A). *See* 786 F.3d at 167. And

in *Hooper*, the claimants could not show that, at the time their husbands committed drug trafficking offenses, they had vested or superior interests in assets purchased with the proceeds of those offenses. *See* 229 F.3d at 821–22.

Section 853(n) does not allow for "relitigation of the forfeitability of the property; its only purpose is to determine whether any third party has a legal interest in the forfeited property." FED. R. CRIM. P. 32.2 advisory committee's note to 2000 adoption; *see United States v. Fabian*, 764 F.3d 636, 638 (6th Cir. 2014) (citing same with approval); *United States v. Holy Land Found. for Relief & Dev.*, 722 F.3d 677, 689–90 (5th Cir. 2013) (recognizing same and noting that the Second, Eighth, Tenth, and Eleventh Circuits agree).[9]

## A.    Government's Motion for Summary Judgment

In his Verified Claim, Claimant asserts that Josephine and the other co-owners of Donnarich owed him a fiduciary duty and breached it by stealing Donnarich's assets and transferring them to competing ventures. (*See* Verified Claim ¶¶ 10–12.) He argues that the court should hold at least 50% of the transferred assets—which, he says, are "inextricably intertwined with" the POF assets—in a constructive trust for his benefit. (*Id.* ¶ 12.) Alternatively, Claimant argues that Josephine's missed spousal support payments establish a lien in his favor against the POF assets. (*See id.* ¶¶ 9, 13–15.) He also argues that because Donnarich was funded with marital property and Josephine embezzled assets from Donnarich, the POF assets constitute marital property in which he has a legal interest. (*See id.* ¶¶ 16–19.) The Government argues that it is entitled to summary judgment because the undisputed record shows that Claimant did not have a vested or superior interest in the POF assets at the time of the criminal acts giving rise to forfeiture. (*See* Gov't Mem. in Supp. of Mot. for Summ. J. ("Gov't Br.") [735] at 9.) As

---

[9]      The Seventh Circuit has implicitly recognized this principle as well. *See United States v. De Ortiz*, 910 F.2d 376, 381 (7th Cir. 1990) ("When the government proves that property held by a third party is forfeitable, then § 853(n)(6) sets forth the court's authority to decide who as between the government and the third party has title to such property.")

explained here, the court agrees that neither of Claimant's theories establish a vested or superior interest in the assets at issue.

### 1. Constructive trust

"[A] lawful property interest" for purposes of the relevant forfeiture statues "is created and defined by state law." *United States v. Bowser*, 834 F.3d 780, 784 (7th Cir. 2016). Under Illinois law, a constructive trust is "raised by operation of law" rather than "by express agreement." *Suttles v. Vogel*, 126 Ill. 2d 186, 193, 533 N.E.2d 901, 904, 127 Ill. Dec. 819, 822 (1988) (internal quotation marks omitted). A court may impose a constructive trust as "an equitable remedy . . . to redress unjust enrichment caused by a party's wrongful conduct." *Eychaner v. Gross*, 202 Ill. 2d 228, 274, 779 N.E.2d 1115, 1143, 269 Ill. Dec. 80, 108 (2002). "A constructive trust is created when a court declares the party in possession of wrongfully acquired property as the constructive trustee of that property . . . because it would be inequitable for that party to retain possession of the property." *Suttles*, 126 Ill. 2d at 193, 533 N.E.2d at 904, 127 Ill. Dec. at 822. In general, a court may impose a constructive trust "in two situations: first, where actual or constructive fraud is considered as equitable grounds for raising the trust and, second, where there is a fiduciary duty and a subsequent breach of that duty." *Id.*

A court will not impose a constructive trust "unless the complaint makes specific allegations of wrongdoing," such as "fraud, breach of fiduciary duty, duress, coercion or mistake." *Id.*, 126 Ill. 2d at 194, 533 N.E.2d at 905, 127 Ill. Dec. at 823. A corporate officer's knowledge or notice of the relevant wrongdoing "generally is imputed to the corporation." *People ex rel. Daley v. Warren Motors, Inc.*, 114 Ill.2d 305, 320, 500 N.E.2d 22, 28, 102 Ill. Dec. 400, 406 (1986) (where corporation's owner and president knew that it was using "illegal means" to obtain reductions in tax assessments, lower court properly imposed constructive trust against the benefits the corporate defendant had realized from those reductions). "[T]he grounds for imposing a constructive trust must be so clear, convincing, strong and unequivocal as to lead to but one conclusion." *Suttles*, 126 Ill. 2d at 194, 533 N.E.2d at 905, 127 Ill. Dec. at 823.

Significantly, "[t]he proceeds of the alleged wrongful conduct must exist as an identifiable fund traceable to that conduct, such that it can become the *res* of the proposed trust." *Eychaner*, 202 Ill. 2d at 274, 779 N.E.2d at 1143, 269 Ill. Dec. at 108. Once a court determines that specific assets constitute the *res* of the constructive trust, the "sole duty of the constructive trustee is to transfer title and possession of the wrongfully acquired property to the beneficiary." *Suttles*, 126 Ill. 2d at 193, 533 N.E.2d at 904, 127 Ill. Dec. at 822; *see also* <u>Dexia Credit Local v. Rogan</u>, 629 F.3d 612, 630 (7th Cir. 2010) ("A party seeking a constructive trust must establish the existence of identifiable property to serve as the res upon which a trust can be imposed and possession of that res or its product by the person who is to be charged as the constructive trustee." (internal quotation marks omitted)). Claimant correctly observes that a constructive trust is not a standalone claim, but rather "an equitable remedy for certain claims in restitution." *In re Mississippi Valley Livestock, Inc.*, 745 F.3d 299, 304 (7th Cir. 2014).

According to the Government, the undisputed evidence shows that Claimant cannot identify how the POF assets "are traceable to the inequitable conduct he purportedly suffered," which means that his claim for restitution through a constructive trust fails as a matter of law. (Gov't Br. at 12; *see Eychaner*, 202 Ill. 2d at 274, 779 N.E.2d at 1143, 269 Ill. Dec. at 108.) It is undisputed that assets that Claimant co-owned with Josephine were invested into Donnarich, that Claimant was a 50% owner of the company, and that hundreds of thousands of dollars were transferred from Donnarich to Josdan, PHSI, and Josephine starting in March 2007. (*See, e.g.*, Gov't L.R. 56.1 Resp. ¶¶ 1, 2, 12, 13, 14, 16). As the Government emphasizes, however, there is no evidence that any funds belonging to Claimant were used to purchase the POF assets. To the contrary, the Government's tracing analysis shows that "the POF assets were purchased with proceeds from the healthcare fraud and as part of the money laundering conspiracy . . . ." (Gov't Br. at 13.) Under the relation back doctrine, the Government contends, "title to those assets vested with the United States at the moment they were purchased." (*Id.* (citing 18 U.S.C. § 982(a)(1); 21 U.S.C. § 853(c).)

Indeed, as noted, Claimant admits that he "has no basis . . . to specifically dispute any particular portion of the Government's tracing" and that the Government's analysis "did not directly identify funds belonging to him as the source of funds used to purchase the POF assets." (Cl. L.R. 56.1 Resp. ¶¶ 26, 33.) He also concedes that a constructive trust is "not an appropriate remedy for those assets whose source [the Government] was able to trace back to the Defendants' fraudulent Medicare billing." (Cl. Br. at 20.) Claimant maintains, however, that the court should impose a constructive trust for his benefit on the POF assets not directly traceable to Medicare fraud—specifically, 25 percent of the portion of POF assets that were purchased with payments from Medicare (because it is possible that those payments were obtained legally), and an additional $401,548 (or $398,132), which is the portion of the POF assets that was purchased using "unspecified sources." (*Id.*) Claimant argues that he is a victim of the underlying crimes and that "equity demands" he receive restitution "to prevent unjust enrichment to Defendants." (*Id.*)

Claimaint's constructive trust theory fails for two reasons. First, though Claimant may well have been the victim of wrongdoing at the hands of his wife, he is not the victim of the money laundering and Medicare fraud crimes to which Ms. Guerrero and others pleaded guilty. More significantly, there is no evidence that Josephine or others used money belonging to Claimant to purchase any portion of the POF assets. Accordingly, no reasonable jury could find that the portion of the POF assets Claimant seeks is traceable to the wrongdoing he suffered. In turn, no reasonable jury could find that any portion of the POF assets comprise the *res* of a constructive trust.

Second, Claimant's argument that he is entitled to the POF assets not directly traceable to Medicare fraud ignores that those assets are "involved in" Guerrero's criminal offense. *See* 18 U.S.C. § 982(a)(1). That makes them forfeitable, as this court determined in the preliminary order of forfeiture. *See id.*; POF ¶¶ (b), (d). Claimant is not permitted to relitigate that decision. *See, e.g.*, *Fabian*, 764 F.3d at 638; Gov't Reply at 10. Even if he were, he would not prevail. As the

Government explains, comingling "clean" money with crime proceeds can "make[ ] money laundering less difficult and may even be necessary to the successful completion of the offense." *United States v. Baker*, 227 F.3d 955, 970 (7th Cir. 2000), *cert. denied*, 531 U.S. 1151 (2001) (quoting *United States v. Tencer*, 107 F.3d 1120, 1134 (5th Cir. 1997)).  As a result, courts have found that untainted funds are "involved for purposes of the forfeiture statute."  *Baker*, 227 F.3d at 970 (internal quotation marks omitted) (citing *Tencer*, 107 F.3d at 1134).   Here, the Government's tracing analysis—which Claimant admits he has no basis to dispute—shows that *all* of the funds used to purchase the POF assets were involved in money laundering. (*See* Gov't Reply at 12; Campbell Decl., Exs. C–G.)  Accordingly, the POF assets are forfeitable in their entirety.  By the same token, as the Government correctly argues, title to the POF assets vested with the United States as soon as they were purchased, and Claimant never had a legal interest in them.  *See, e.g.*, *Watts*, 786 F.3d at 166–67; *Hooper*, 229 F.3d at 821–22; *United States v. Simmons*, No. 17-CR-127 (KMW), 2019 WL 3532113, at *4 (S.D.N.Y. Aug. 2, 2019) (because the property at issue was purchased with proceeds of her husband's criminal offense, claimant could not plausibly allege that she "ever held any 'right, title, or interest' in the [p]roperty that could support a claim under § 853(n)(6)(A)" (citing *Watts*, 786 F.3d at 166–67)).[10]

---

[10]        On reply, the Government contends that because no jury reasonably could find that Claimant has a legal interest in the POF assets, he lacks standing to proceed under Section 853. (*See* Gov't Reply at 16–17 (citing 18 U.S.C. § 853(n)(3) (requiring petitioner to "set forth the nature and extent of [his] right, title, or interest in the property")); *see also id.* § 853(n)(2) (providing that a third party "asserting a legal interest" in forfeited property may "petition the court for a hearing to adjudicate the validity of his alleged interest in the property").)   As the court reads the Government's arguments, however, they are reasons that Claimant has no valid claim under Section 853(n)—not that he lacks Article III standing.  Claimant here satisfies the requirements of Article III:  he asserts a concrete injury, allegedly caused by the criminal defendants and the Government, that likely would be redressed by a favorable order here.  Therefore, even if Claimant lacks so-called "statutory standing" under Section 853(n), the court can properly adjudicate the merits of his Verified Petition.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 & n.4 (2014) (explaining that the "statutory standing" inquiry is best understood as addressing whether a person has a right to sue under the statute); *see also, e.g.*, *Catala*, 870 F.3d at 10 (bypassing the "inquiry into statutory standing" under Section 853(n) and assessing the merits of the verified petition where the claimant had Article III standing).

Claimant nonetheless suggests that the court should award him restitution "to help make him whole for his loss, whether by way of a 'constructive trust' or some other remedy." (Cl. Br. at 21.) The case Claimant cites for that proposition concerned whether the district court erred in refusing to "offset the value of the forfeited properties against the restitution amount," not whether the victim of the underlying crime was owed restitution in the first place. *United States v. Emerson*, 128 F.3d 557, 559 (7th Cir. 1997). So Claimant takes out of context the Seventh Circuit's statement in *Emerson* that a district court has discretion to impose a sentence of restitution *and* order a defendant to forfeit crime proceeds, *see id.* at 567. *Emerson* does not establish that this court must award Claimant any portion of the POF assets under any legal theory. Claimant also argues that because the criminal defendants transferred assets "among numerous co-conspirators" to hide their source, "it should matter very little exactly how those assets are presently titled or may be traced . . . ." (Cl. Br. at 21.) The case he cites in support of this argument, however, *United States v. Martin*, 195 F.3d 961 (7th Cir. 1999), does not suggest that tracing does not matter; *Martin* states only that the liability of co-conspirators for restitution under the Mandatory Victims Restitution Act of 1996 is joint and several. *Id.* at 968–69.[11]

For the reasons just explained, Claimant's argument that the court should impose a constructive trust on the POF assets representing funds not traceable to Medicare fraud (including the "unspecified sources") does not withstand scrutiny. The court therefore turns to consideration of his alternative bases for recovery of these assets: his marital interest and marital lien theories.

### 2. Marital interest and marital lien

Under the Illinois Marriage and Dissolution of Marriage Act, "marital property" means "all property . . . acquired by either spouse subsequent to the marriage," with exceptions that are inapplicable here. 750 ILCS 5/503(a). "For purposes of distribution of property, all property

---

[11]　　The court addresses Claimant's other arguments that he is entitled to restitution in its analysis of his cross-motion for summary judgment, below.

acquired by either spouse after the marriage and before a judgment of dissolution of marriage or declaration of invalidity of marriage is presumed marital property . . . . regardless of whether title is held individually or by the spouses in some form of co-ownership . . . ." *Id.* § 503(b)(1).

During a marriage, "[e]ach spouse has a species of common ownership in the marital property which vests at the time dissolution proceedings are commenced . . . ." *Id.* § 503(e). That is, "Illinois law does not establish independent ownership interests in marital property at the moment it is acquired," nor does it "wait to establish such interests until the divorce court issues a final order" of dissolution. *In re Thorpe*, 881 F.3d 536, 540 (7th Cir. 2018). Instead, "Illinois occupies a middle ground" wherein "[d]ivorcing spouses are vested with independent contingent interests in all marital property at the moment a divorce petition is filed." *Id.*; *see also In re Marriage of Centioli*, 335 Ill. App. 3d 650, 656, 781 N.E.2d 611, 616, 269 Ill. Dec. 814, 819 (1st Dist. 2002) ("[D]uring the pendency of the divorce proceedings," each spouse "has a vested interest in all marital property regardless of which party holds title to it."). Then, when at the conclusion of proceedings the divorce court "divides marital property, the obtaining spouse's contingent interest in that property ripens into a full ownership interest." *In re Thorpe*, 881 F.3d at 540. "[T]he spouse who is not awarded the property sees his contingent interest vanish." *Id.*

Under these principles, Claimant asserts, he obtained a vested contingent interest in all marital assets when Josephine filed for divorce in November 2006. (Cl. Br. at 22; Claimant Reply in Supp. of Cross-Mot. for Summ. J. ("Cl. Reply") [752] at 5.) He further states that his contingent interest became a 100 percent ownership interest in either April 2015, when the Cook County Circuit Court granted his Second Verified Petition, or in October 2012, when it "entered its final judgment of dissolution."[12] (Compare Cl. Br. at 22 *with* Cl. Reply at 5.) He maintains that the POF assets include marital property, and that he therefore has a vested legal interest in those

---

[12] Although the October 5, 2012 order was a "Partial Judgment of Dissolution," it "issued a formal order of dissolution." (Cl. L.R. 56.1 Resp. ¶ 28.) Accordingly, Claimant's reference to the "final judgment of dissolution" appears to be a reference to that order.

assets for purposes of 21 U.S.C. § 853(n)(6)(A).  (*See, e.g.*, Cl. Br. at 22–23.)  Claimant requests "restitution . . . in the following amount from the POF assets":  "$811,400.00, representing the sum of various personal and marital assets that [Claimant] invested [in] Donnarich", or "[t]he sum of $401,548.00, which represents the untraceable funds from other/unknown sources not traceable back to the Government", and/or "[s]ome further or alternative sum of restitution that the Court deems just."  (Cl. Br. at 28; Cl. Reply at 8.)

Claimant's marital interest theory fails for at least two reasons.  First, the criminal defendants did not purchase the POF assets until after they fraudulently obtained payments from Medicare and engaged in a conspiracy to launder monetary assets.  They purchased the POF assets using only (1) the fraudulently obtained Medicare payments and (2) funds involved in money laundering.  (*See, e.g.*, Gov't Reply at 19.)  As already discussed, under the relation-back doctrine, neither Claimant nor the criminal defendants ever had an interest in the POF assets; the interest vested in the United States "upon purchase."  (Gov't Br. at 15; *see* 21 U.S.C. § 853(c) (property subject to criminal forfeiture "vests in the United States upon the commission of the act giving rise to [the] forfeiture"); *see also, e.g.*, *Hooper*, 229 F.3d at 821, 823 ("There was no community property interest [in assets purchased with proceeds of drug sales] at the moment the husbands violated the drug trafficking statute," and even if there was, "such an interest is not one Congress intended to protect from forfeiture under § 853(n)(6)(A) of the federal criminal forfeiture statute").)  Independent of the relation-back doctrine, Claimant has offered no evidence that the POF assets are traceable to the $811,400 investment that he and Josephine made in Donnarich.  Nor has he offered evidence that he or Josephine owned the $401,548 in "unspecified sources" used to purchase the POF assets.  (*See, e.g.*, Gov't Reply at 17.)  Accordingly, no reasonable jury could find that the POF assets contain marital property.  The same reasoning defeats Claimant's theory that he has a legal interest in the POF assets because Josephine's missed spousal support payments created a lien in his favor against her interest in the marital estate.

Because Claimant cannot establish, as a matter of law, that he has a marital property- or

marital lien-based legal interest in the POF assets, he cannot survive summary judgment. *See* 21 U.SC. § 853(n)(6)(A) (requiring Claimant to prove by a preponderance of the evidence that, among other things, he "has a legal right, title, or interest" in the forfeitable property).

Claimant contends this result is inequitable, and indeed, his circumstances are sympathetic—but the law does not support his arguments. For example, Claimant contends that the underlying crimes caused him extensive financial losses, leaving him unable to afford a sophisticated tracing analysis that could prove his interest in the POF assets. (*See, e.g.*, Cl. Br. at 4.) He also notes that the Government's tracing analysis depends heavily on financial records he voluntarily provided. (*See* Cl. Reply at 3.) Claimant suggests that in these circumstances, he should not be required to "directly" trace the funds that the criminal defendants allegedly stole from him to the POF assets. (Cl. L.R. 56.1 Resp. ¶¶ 26, 33; *see* Cl. Br. at 4; Cl. Reply at 6–7.) In support, Claimant cites *United States v. $448,342.85*, 969 F.2d 474 (7th Cir. 1992). He quotes the court's observation that tracing "rules designed to adjust accounts between (apparently) honest persons are not suited to frauds in which funds have been shuffled at least in part for the purpose of disguising their source." *Id.* at 477. In *$448,342.85* (which Claimant does not otherwise discuss), the court held that the civil forfeiture statute does not permit the government to seize all funds in a bank account merely because the defendant used the account in a money laundering scheme. *See id.* at 476. That is not what the Government is advocating here. Rather, the Government claims that it is entitled to the POF assets in their entirety because its undisputed tracing analysis shows that all funds used to purchase the assets were involved in the underlying criminal offense. The holding in *$448,342.85*, therefore, has no application here. And if anything, the result in that case supports the Government's position. *See id.* at 477 (determining that the government was entitled to the entire balance in the bank account because "the criminal proceeds vastly exceed[ed] the sums on deposit at the time of the seizure," the defendants "had only one line of business" (which had been involved in the fraud), and the defendants could not identify funds in the account that were traceable to lawful activities). Similarly here, the criminal proceeds

used to purchase the POF assets exceeded the value of Claimant's investment in Donnarich, and Claimant lacks affirmative evidence that any of the funds used to purchase the POF assets came from lawful activities.

Next, Claimant observes that under Illinois law, fraud committed against marital property is remediable even if it occurs before the marriage is dissolved. (Cl. Reply at 6 (citing *Hofmann v. Hofmann*, 94 Ill. 2d 205, 220, 222, 446 N.E.2d 499, 505, 506, 68 Ill. Dec. 593, 599, 600 (1983)).) It follows, he argues, that the court should not leave him "without a remedy for the theft of his substantial marital assets by Josephine and her co-conspirators . . . ." (Cl. Reply at 6 (citing *Hofmann*, 94 Ill. 2d at 222, 446 N.E.2d at 506, 68 Ill. Dec. at 600; *Willoughby v. Willoughby*, 758 F. Supp. 646, 649 (D. Kan. 1990) (under Kansas law, which is similar in relevant part to Illinois law, courts must divide marital property "in a just and equitable manner, regardless of [its] title or origin").) Claimant also notes that federal laws governing criminal forfeiture do not contemplate seizure of an innocent spouse's property to satisfy the offending spouse's forfeiture obligations. (*See* Cl. Reply at 6 (citing *United States v. Chavez*, 323 F.3d 1216, 1219 (9th Cir. 2003) ("The property of an innocent spouse is not to be taken to satisfy a forfeit of her husband."); *United States v. Lester*, 85 F.3d 1409, 1412–15 (9th Cir. 1996) (similar)).) But those cases involved assets in which an innocent spouse had a legal interest. Because the evidence here does not permit a reasonable finding that Claimant has a legal interest in the POF assets, the cited authorities do not assist him.

Claimant also contends that seizing the portion of the POF assets purchased with "unspecified sources" would constitute an improper *in rem* forfeiture because those sources are not traceable to the defendants' criminal conduct. (Cl. Reply at 7.) But the cases he cites stand for a different principle. (*See id.* (citing, *inter alia*, *United States v. Peters*, 777 F.2d 1294, 1296 (7th Cir. 1985) ("An examination of the forfeiture provision [that predated § 853(n)] reveals that Congress clearly intended that the government acquire only that interest which the criminal defendant held in the property.")).) Claimant speculates that the "unspecified sources" never

belonged to Guerrero. (*See* Cl. Br. at 4.) But there is no evidence that establishes the origin of these sources, so no reasonable jury could agree that Claimant has an interest in them. And contrary to Claimant's protestations, seizing the unspecified sources would not "unjustly punish" him (Cl. Reply at 7), because he has provided no evidence showing that they belonged to him.

Finally, Claimant argues that the court has "inherent authority to allocate the seized assets in a more equitable manner." (*Id.*) But the court has already determined that the POF assets are forfeitable in their entirety. Claimant's only path to recovery is showing that the forfeiture order is "invalid in whole or in part" because he has a legal interest in the POF assets that is vested or superior as described in 18 U.S.C. § 853(n)(6)(A). On this record, no reasonable jury could determine that he has satisfied that burden. The cases Claimant cites for the proposition that the court can nevertheless allocate the POF assets to him are inapposite because none involves an ancillary proceeding under Section 853(n). *See United States v. Henshaw*, 388 F.3d 738 (10th Cir. 2004) (claim for tortious conversion); *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80 (2d Cir. 2002) (receivership proceeding); *In re Lichtenberger*, 337 B.R. 322 (Bankr. C.D. Ill. 2006) (objection to claim of exemption in Chapter 7 bankruptcy proceeding); *Griffin Wellpoint Corp. v. Engelhardt, Inc.*, 92 Ill. App. 3d 252, 414 N.E.2d 941, 46 Ill. Dec. 888 (2d Dist. 1980) (action for relief under a contractor's bond).

For the reasons explained above, the Government's motion for summary judgment is granted.

## B. Claimant's Cross-Motion for Summary Judgment

In his cross-motion for summary judgment, Claimant argues that he is a crime victim as defined in the Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663A ("MVRA"), and the Crime Victims' Rights Act, 18 U.S.C. § 3771 ("CVRA"). He maintains that these statutes require the court to award him restitution totaling at least $811,400—"the amount of his original investment stolen by Defendants." (Cl. Br. at 26.)

"[F]ederal courts possess no inherent authority to order restitution, and may do so only as

explicitly empowered by statute." *United States v. Randle*, 324 F.3d 550, 555 (7th Cir. 2003) (quoting *United States v. Hensley*, 91 F.3d 274, 276 (1st Cir. 1996)). "Congress has, however, provided statutory authorization for court-ordered restitution in certain circumstances." *Randle*, 324 F.3d at 555. The MVRA is one source of statutory authorization. *See id.* It provides that the sentencing court "'*shall* order' restitution to the victims of certain specified offenses, including those which result in 'an identifiable victim or victims [who] has suffered . . . pecuniary loss.'" *Id.* (quoting 18 U.S.C. §§ 3663A(a)(1), (c)(1)(B)); *see also United States v. Scalzo*, 764 F.3d 739, 744 (7th Cir. 2014) (The MVRA "requires certain offenders to restore property lost by their victims as a result of the crime.") (quoting *Robers v. United States,* 572 U.S. 639, 640 (2014)).

The MVRA defines a "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered" or "in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663(A)(a)(2). The Seventh Circuit has interpreted these provisions as authorizing restitution "first, to a victim directly harmed by the offender's *specific conduct* that is the basis of the offense of conviction," and "second, to a victim who is directly harmed by the offender's conduct in the course of committing an offense that involves *as an element* a scheme, conspiracy, or pattern." *Randle*, 324 F.3d at 556 (emphasis in original) (internal quotation marks omitted); *see also Scalzo*, 764 F.3d at 746; *United States v. Marr*, 760 F.3d 733, 744 (7th Cir. 2014).[13] "Victims seeking to recover their losses from a defendant must prove that the defendant caused the loss, and must demonstrate that the loss would not have occurred but for the defendant's misconduct." *Scalzo*, 764 F.3d at 746; *see also United States v. Allen*, 529 F.3d 390, 396 (7th Cir. 2008); Cl. Br. at 25 (citing *Allen*, 529 F.3d at 396). The MVRA has both a but-for

---

[13]     Courts are also permitted to order restitution to persons other than a "victim" only "if agreed to by the parties in a plea agreement." 18 U.S.C. § 3663A(a)(3).

and proximate causation requirement. *See United States v. Burns*, 843 F.3d 679, 689 (7th Cir. 2016); *see also Martin*, 195 F.3d at 968 ("[T]he existence of a causal relation between the defendant's conduct and the loss that the Act requires him to restore is essential . . . .").

The CVRA guarantees certain rights to the victims of federal crimes, including "[t]he right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6). It defines a crime victim as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia." *Id.* § 3771(e)(2)(A). Like the definition of a victim in the MVRA, this definition "encompasses the traditional 'but for' and proximate cause analyses." *In re Rendon Galvis*, 564 F.3d 170, 175 (2d Cir. 2009); *see also, e.g.*, *In re McNulty*, 597 F.3d 344, 350 (6th Cir. 2010); *United States v. Scudder*, 746 F. App'x 454, 457 & n.1 (6th Cir. 2018) (observing that the MVRA and CVRA "contain identical language regarding causation"). "[T]he CVRA's reference to restitution is a purely procedural one, intended to facilitate a victim's ability to participate directly in the criminal process; it does not expand any substantive rights to restitution provided by the MVRA or other statutes." *Fed. Ins. Co. v. United States*, 882 F.3d 348, 358 (2d Cir. 2018).

Here, the relevant criminal offense for purposes of both statutes is "conspiracy to launder the proceeds of health care fraud and unlawful payments for patient referrals" in violation of 18 U.S.C. § 1956(h). (Guerrero Plea Agreement ¶ 5; *see also id.* ¶ 6 (specifying that Guerrero conspired with Josephine to "knowingly conduct financial transactions involving the proceeds of health care fraud and unlawful bribes and kickbacks," in violation of 18 U.S.C. § 1956(a)(1)(B)(i), "knowing that the property involved in the transactions represented proceeds of some form of unlawful activity, and knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity").)

Claimant argues that Guerrero's violation of Section 1956(h) proximately caused his injury because the defendants committed money laundering "to further their larger criminal scheme,

which began with their theft of [his] assets to fund their other, illegitimate operation." (Cl. Br. at 24.) He also states that "the purpose of [the criminal defendants'] money laundering was to hide their fraud proceeds from [their] victims." (*Id.*) Regarding but-for causation, Claimant contends that he would not have lost his investments in Donnarich if Guerrero had not committed the charged offense. (*See id.* at 26 (stating that the criminal defendants "converted his investment to fund their separate venture, kicked him out of his own company so that they could act with impunity, and then laundered said assets by transferring them into other shell companies and sham accounts").) The Government responds that Claimant is not a victim for purposes of either statute because Guerrero's "crime specifically defrauded the Government, and not individuals." (Gov't Reply at 21–22.)

The court agrees with the Government. Guerrero pleaded guilty to conspiracy to launder monetary instruments as part of a healthcare fraud scheme. (Guerrero Plea Agreement ¶ 5.) She did not plead guilty to conspiracy to launder the assets allegedly stolen from Claimant. Furthermore, although Claimant maintains that Guerrero laundered assets allegedly stolen from him, the only tracing evidence in the record concerns the POF assets—and Claimant has identified no evidence showing that the POF assets are traceable to the stolen funds. Finally, Claimant's argument that Guerrero and others stole his assets and removed him as Donnarich's president so that they could commit health care fraud is conjectural. The evidence simply does not permit a finding that Claimant would not have suffered his loss but for Guerrero's "specific conduct" forming the basis of her conviction or her "conduct in the course of committing" the conspiracy. *Randle*, 324 F.3d at 556. Nor could a reasonable jury conclude that the evidence shows a causal nexus between the charged offense and Claimant's loss sufficient to satisfy the MVRA's and CVRA's proximate causation requirements. *Compare, e.g.*, *Marr*, 760 F.3d at 744–45 (under the MVRA, bank "easily qualifie[d] as a victim" of the defendant's wire fraud where the defrauded customers received refunds paid from the defendant's merchant account at the bank, the bank used its own funds to pay refund requests made after the defendant had depleted the

funds in the merchant account, and the defendant never reimbursed the bank).

The court denies Claimant's cross-motion for summary judgment for the reasons just explained. Accordingly, it need not address the Government's arguments that Claimant waived his claim to restitution by failing to assert it before Guerrero's sentencing hearing,[14] or that the court lacks authority to award restitution from the POF assets.

## CONCLUSION

For the foregoing reasons, the court grants the Government's motion for summary judgment [734] and denies Claimant's cross-motion for summary judgment [742]. The Government's motion to strike [697] is terminated as moot.

ENTER:

Dated: June 22, 2021

REBECCA R. PALLMEYER
United States District Judge

---

[14] The MVRA directs the probation officer and, where relevant, the Government, to collect information about victims' losses *before* the defendant's sentencing hearing, so that the court can properly fashion a restitution order. *See* 18 U.S.C. §§ 3664(a)–(d). The MVRA contemplates that the court will make a final determination of the victim's losses at the time of sentencing or, if that is not feasible, within 90 days after sentencing. *See id.* § 3664(d)(5). If a victim "*subsequently* discovers *further* losses," he must petition the court for an *amended* restitution order within 60 days of discovering the losses. *Id.* (emphasis added). An amended order "may be granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief." *Id.* Claimant suggests that the Government did not fulfill its responsibility to timely identify him as crime victim under the MVRA (*see* Cl. Reply at 3), but he does not discuss authority that addresses a situation where, as here, the victim knew about his losses before sentencing. (*See id.*) Furthermore, neither side cites authority that discusses whether an ancillary proceeding under 18 U.S.C. § 853(n) and Federal Rule of Criminal Procedure 32.2(c) is considered part of sentencing for purposes of the MVRA. Finally, neither side discusses what "timely" means under the CVRA. *See generally* 18 U.S.C. § 3771.